UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 4:14–CR–250 CDP |
| | ) | |
| KYLE KIENSTRA, | ) | |
| | ) | |
| Defendant. | ) | |

SENTENCING HEARING

BEFORE THE HONORABLE CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

AUGUST 12, 2015

APPEARANCES:

For Plaintiff:        Stephen Casey, Esq.
                      OFFICE OF THE U.S. ATTORNEY
                      111 South 10th Street, 20th Floor
                      St. Louis, MO  63102

For Defendant:        Carter Collins Law, Esq.
                      LAW AND SCHRIENER, LLC
                      141 N. Meramec Avenue, Suite 314
                      St. Louis, MO  63105

Reported By:          SHANNON L. WHITE, RMR, CRR, CSR, CCR
                      Official Court Reporter
                      United States District Court
                      111 South Tenth Street, Third Floor
                      St. Louis, MO  63102
                      (314) 244-7966

PRODUCED BY COURT REPORTER COMPUTER–AIDED TRANSCRIPTION

1        **(PROCEEDINGS STARTED AT 3:04 PM.)**

2     **(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT AND WITH**

3                   **THE DEFENDANT PRESENT:)**

4              THE COURT:  All right.  We are here in the case of

5     United States of America versus Kyle Kienstra.  This is Case

6     No. 4:14-CR-250, and we are here for sentencing.  Mr. Kienstra

7     is here in person and with his attorney, Ms. Law, and the

8     United States is here through Mr. Casey.

9              I know we have several things to discuss here,

10    including objections, but let me see counsel and Mr. Kienstra

11    at side bar briefly before we begin, to see if there's

12    anything else we need to go over.

13          **(A SEALED BENCH CONFERENCE WAS HELD ON THE RECORD.)**

14             THE COURT:  All right.  So the objections that are

15    still pending, the defendant objected to the presentence

16    report because it attributed possession of a firearm to the

17    defendant.  After discussing that, the probation office

18    conceded that he had not admitted himself possessing that --

19    those firearms, the many that were seized in this case by his

20    compatriots -- or from including an apartment where supposedly

21    he lived according to the presentence report.  But they agreed

22    with that; so they took out the 2 levels for the gun.

23             There is still, as I see it, one objection that has

24    not been resolved and is not moot, and that is the objection

25    to whether he should receive the 4 levels for being an

1   organizer or leader of this drug trafficking organization or

2   whether he should only get 3 levels for being a manager or

3   supervisor.  The plea agreement agreed to the 3 levels as a

4   manager or supervisor.  So I think that still needs to be

5   ruled on.

6          However, the plea agreement also had an arithmetic

7   mistake.  It said that if you added 30 plus 2 plus 3, which

8   takes us up to 35, if we can do this in our heads, and then

9   you'd deduct 3, the plea agreement said that equaled 31.  I

10  suspect there are lots of people in here who could say 35

11  minus 3 does not equal 31.  It equals 32.  So the plea

12  agreement had an arithmetic mistake that has an impact on the

13  sentencing guidelines range.  And so we need to rule on that.

14  We need to determine how that's going to be handled.

15         So does either party wish to present any evidence on

16  that -- not the arithmetic mistake but the issue of the 3

17  levels for organizer or leader or the 4 levels -- I'm sorry --

18  4 levels for organizer or leader under 3B1.1, or should he

19  only get 3 levels for being a supervisor or manager under that

20  same guideline provision?  Does either side wish to present

21  any evidence on that point?

22         MS. LAW:  No, Judge.

23         MR. CASEY:  I do not, Judge.

24         THE COURT:  Okay.  And so although I have read the

25  probation office's response to that, and based on the facts in

4

1   the presentence report, I believe the probation office is in

2   fact correct.  I am going to sustain the objection because it

3   was part of the parties' plea agreement, and so I believe it

4   is appropriate to give them the benefit of that plea

5   agreement.  And so I'm going to sustain the objection that

6   paragraph -- let me find the right paragraph -- that he should

7   not receive -- paragraph 108.  Should not give him 4 levels

8   under 3B1.1(a) but should instead give him only 3 levels under

9   3B1.1(b).  Let me make sure I'm saying this right.

10          Yeah.  So that for an aggravating role, I conclude

11  that he -- I'm sustaining the objection.  I conclude he was a

12  manager or supervisor but not an organizer or leader of the

13  criminal activity that involved five or more participants or

14  was otherwise extensive.  So he should receive 3 levels for

15  that.

16          Now, I will hear any arguments you all want to make

17  about the arithmetic error because it seems to me that I'm

18  calculating that there's a total offense level of 32.  He's in

19  criminal history category 1, and so the guidelines range is

20  121 to 151 months under that scenario.

21          The defendant argued in the sentencing memorandum and

22  in the amended objections that he should -- without actually

23  discussing the fact that it was an arithmetic error, argue

24  that the range should be -- well, you said 108 to 135, but

25  there is a ten-year mandatory minimum sentence in this case;

1  so it's really 120 to 135 months.

2        So I just want to hear.  Are you all -- what are you

3  asking me to do about this arithmetic mistake?

4        MS. LAW:  Judge, when I filed the amended

5  sentencing -- or, I'm sorry -- the amended objection, the

6  reason I didn't talk about the arithmetic error is because,

7  quite frankly, I assumed that the error had been mine.  When I

8  said 32, in fact --

9        THE COURT:  It was in the plea agreement, and you

10  weren't there.

11        MS. LAW:  That's all exactly correct, Judge.  And Mr.

12  Kienstra just pointed out to me that the plea agreement said

13  31.  I think I had done the math just like you just did

14  without looking at the plea agreement.  And so I just assumed

15  I had been looking at a wrong offense level.  For some reason,

16  just that's -- that was my assumption.

17        THE COURT:  Yeah.

18        MS. LAW:  And so I just filed the amended thing just

19  to give you, the Court, where we believed that his range

20  should be.  Frankly, Judge, upon looking the back at it, I've

21  never had this happen before.

22        THE COURT:  Yeah.  I have, unfortunately.  You'd

23  think I'd learn to add them up myself at the time of the plea.

24        MS. LAW:  Well, you know, and I did go to law school

25  because I didn't think I was going to have to do math; so I'm

1    surprised that I haven't done it before, but I've just never

2    run into that exactly.  So I had concern because it is a plea

3    agreement that everybody signed and it says 31.  And, quite

4    honestly, when I spoke to Mr. Casey about it, he said,

5    "Carter, it's our plea agreement.  I signed it.  I'll stand by

6    it."  It was an error, but it's everybody error, and that's

7    what he thought he was agreeing to.

8            And, frankly, I think probably, Judge, to give the

9    parties their due, I'm certain that everybody was focused on

10   the fact that it was a 120-month mandatory minimum at the

11   point; and, of course, the plea agreement also says the

12   parties all agree that if that mandatory minimum stays in

13   effect for whatever reason, we all agree that 120 months is

14   fine.

15           And so I kind of think that that would have taken

16   their eyes off of the offense level itself perhaps because

17   there was that mandatory minimum in between -- just holding

18   forth.

19           I guess, Judge, I have not got a fancy legal argument

20   for you today.  My concern is simply that, honestly, as a

21   practical reality, it is difficult enough for me to explain to

22   clients that the plea agreement does mean something because

23   it's a contract between us and the Government, and the

24   Government and we are bound by that contract; and so that's

25   meaningful to you that we have been able to negotiate that.

1            I always, of course, explain that you're not bound to

2    it because you didn't sign off on it.  But it just makes it

3    difficult for me to have to back further away and say, "But it

4    might not mean anything.  At the end of the day, you agreed to

5    it.  It might not mean anything."

6            I know that this is a math error.  I certainly

7    acknowledge that it may be a perfectly obvious math error.  I

8    do not think that anybody was trying to play tricks on the

9    Court or pull a fast one.  I just don't have that impression.

10   I have the impression that it was simply a mistake.

11           And so I'm hoping, particularly under the specific

12   circumstances of this case, Judge, that would be our position

13   with respect to going by the plea agreement.

14           THE COURT:  So, Mr. Casey, what's your position on

15   that?

16           MR. CASEY:  My position, Judge, is that I made a

17   mistake and I'll own it.  I entered into an agreement where I

18   thought the offense level was 31.  I represented that to Mr.

19   Kienstra, Mr. Stobbs at the time.  We all signed on the dotted

20   line.  So, you know, it's my mistake.  I need to do better.

21   And I stand by the plea agreement that I made with Mr.

22   Kienstra.  I think he should be sentenced as if the guideline

23   range is offense level 31 with the criminal history is

24   determined to be 1.  And then the joint recommendation of 120,

25   that can be dealt with based on the reasons set forth in my --

1    in the sentencing letter.

2            THE COURT:  Right.

3            MR. CASEY:  I apologize to the Court and to Mr.

4    Kienstra.

5            THE COURT:  Yeah.  Well, I mean, I don't know what

6    went on in the negotiations, but I didn't notice it at the

7    plea, but it's obvious that, you know, it was an arithmetic

8    mistake.  So let me explain my ruling on this.  This one's a

9    little different from what I just did, but there's a reason

10   for it.

11           I'm not going to give him the 31.  I don't believe it

12   will make a difference in the ultimate sentence in the case

13   because of the issues we've -- in the sentencing letter,

14   but -- in essentially the motion.  But there is a -- so I

15   conclude that it's a total offense level of 32, criminal

16   history category 1.  His advisory guidelines range is 121 to

17   151 months.  There is a ten-year mandatory minimum sentence.

18   So there's only a one-month difference between what is the

19   bottom of the guidelines range under an offense level 31

20   because under offense level 31, criminal history category 1,

21   where there is a ten-year mandatory minimum, the sentencing

22   guidelines range is 120 to 135 months.

23           If there were not a mandatory minimum sentence, the

24   guidelines range would be different, but the guidelines range

25   actually is 120 to 135.  That's the way the guidelines work.

1    So that's what the guidelines is.  It's only one

2  month difference.  Even though they had -- you had a plea

3  agreement with this, I respect that both sides think I should

4  follow the plea agreement.  I'm not going to.  I don't believe

5  the one month is going to make any difference in the ultimate

6  sentence, but the guidelines calculation is 32.  So that's the

7  range.

8    Now, I will tell you the reason this is different

9  from my going along with the plea agreement on the organizer

10  or leader is that on that one that's a legal judgment based on

11  the facts of the case, and so I am deferring to the parties'

12  plea agreement and the Government's concession on the legal

13  judgment based on the facts of the case that we should follow

14  the plea agreement.  I don't think we should follow the plea

15  agreement's arithmetic mistake.  I also do not believe this

16  will make any difference in the ultimate sentence that I will

17  impose.

18    So those are my rulings on the objections, and the

19  guidelines range in the case is 121 to 151 months.  I have

20  read the materials filed by both parties.  The sentencing

21  letter filed by the Government will be filed under seal and

22  treated as a motion.

23    The sentencing memorandum filed by the defendant

24  yesterday, six days late, I'm granting leave of court to file

25  it.

1          MS. LAW:  Thank you, Judge.

2          THE COURT:  It was filed under seal.  I've read that.

3     There are a number of letters attached to it, and I've read

4     those letters.  And so with that said, I would ask you -- I

5     think I've ruled on all the objections that were not moot,

6     really.

7          And so with that said, I would ask Ms. Law to make

8     any statements on your client's behalf you would like; and

9     then, of course, I'll give Mr. Kienstra a chance to say

10    anything he would like.

11         MS. LAW:  And, Judge, I guess the Court will reserve

12    ruling on the Government's sealed --

13         THE COURT:  Well, I'm going to grant it.

14         MS. LAW:  Okay.

15         THE COURT:  It's just a question of what the sentence

16    should be.

17         MS. LAW:  All right.

18         THE COURT:  Yeah, I mean, I am.  And I should have

19    said that, but, you know, it's my intention to grant the

20    Government's request for a downward departure.

21         MS. LAW:  That's fine.  Thank you, Judge.  And,

22    Judge, for the record -- and I'm not going to belabor this.

23    In fact, I'm thinking maybe I can mark this for the record as

24    an exhibit.  I know that you can see that there are many

25    people in the courtroom, but the record, of course, cannot;

1  and from time to time I've had that be an issue.  There are

2  approximately 25 -- 20, 25 people, I think, here.  Many of

3  them are Mr. Kienstra's immediate family -- his mother,

4  father, grandmother, aunts and uncles and some cousins.  There

5  are also many family friends.  Many of the folks who are here

6  in the courtroom, in fact, Judge, are letter writers; that

7  you've read their letters.

8          And so if I can, just to make a record of it, if I

9  can mark this Exhibit, I think, N as in Nancy is what I'm up

10  to for sentencing exhibits.

11          THE COURT:  Okay.

12          MS. LAW:  And so also, Judge, if you would just as a

13  matter of procedure, I always feel like I'm being sort of rude

14  when I ask for this -- not to you but to the probation office,

15  maybe to you through the probation office -- I think that you

16  have to order that the probation office change that

17  calculation for aggravated role under 3B1.1(b) instead of (a).

18  I had a case -- and maybe that's no longer true.  I had a case

19  years ago where an objection was granted at sentencing and we

20  came in -- and, God forbid, I'm sure this will never happen --

21  but we came in on a supervised release revocation, and all the

22  parties were different.  And my poor client kept saying to me,

23  "But that's not my criminal history category.  The judge

24  granted that objection."  And we finally pulled the transcript

25  and it was all true, but it had not been ordered, and so it

1   had not been changed.

2            THE COURT:  Yeah.  No.  We don't actually order -- on

3   something like that, I don't order the probation office to

4   change the presentence report.  It remains as it was.  They

5   don't need to do a new report or refile it.  Instead on the

6   judgment form itself and on the statement -- well, actually,

7   it's on the Statement of Reasons page of the judgment form it

8   will explicitly say that I have sustained the objection to

9   paragraph 108 and that he gets 3 levels under -- saying it

10  wrong again.

11           MS. LAW:  I think it's 3B1 --

12           THE COURT:  3B1.1(b).  And, therefore, the total

13  offense level is 32.

14           That will be actually on the Statement of Reasons

15  page that goes to the Bureau of Prisons and remains part of

16  the court file even though it does not get distributed to the

17  parties in the case.

18           MS. LAW:  Okay.

19           THE COURT:  So it will be made of record, and that

20  will be there if it should ever come up in the future.

21           MS. LAW:  Perfect.  Thank you, Judge.

22           I think that this in some sense is a difficult case,

23  Judge, for sentencing, and I think that it's important to look

24  at Kyle Kienstra in the arc of his entire life.  He is, as we

25  stand here today, quite a young man.  He's not yet 25, I don't

1    think or --

2              THE COURT:  Not yet 26.

3              MS. LAW:  -- 26.

4              THE COURT:  He's 25 already.

5              MS. LAW:  There you go.  Another math error.  At the

6    time that this conspiracy was active, I think he was between

7    the ages of 21 and 24, just about to be 25, I suppose.  I

8    think he turned himself in last -- early last fall, late last

9    August.

10             This is a young man who had, from an extremely early

11   age, a dream to be a professional hockey player.  I believe it

12   is his Uncle Skip who says -- and I think it's Exhibit E --

13   "He has been on the ice or had been on the ice since he was

14   five years old."

15             Although he was proud to earn a place at CBC and was

16   a good student there, he was chosen -- and I believe that this

17   was quite an honor -- to play triple A hockey in Detroit and,

18   in fact, moved to Detroit for all intents and purposes at the

19   age of 16, I think almost 16, and lived with, as he calls it,

20   a billet family, which I think is B-I-L-L-E-T, sort of like a

21   foreign exchange student family, a hockey family.

22             He lived with them all year long.  He came home at

23   Christmas and in the summer.  He was in every respect, I

24   think, on the road to achieving his dream.

25             He is, in my experience with him -- and I have had

14

1   the pleasure and the privilege to spend a great deal of time

2   with Kyle since I took over representation of him back last

3   spring -- he is an extraordinarily goal-oriented person.  He

4   works at a goal with diligence and earnestness, and so it is

5   no question to me that he was firmly on the path of attaining

6   his goal of being a professional hockey player.

7          I'm not, I'm sorry to say, a hockey fan.  I don't

8   watch a lot of hockey, but I've seen a lot of excerpts on the

9   news, and I'm sure that we all have, and it's an

10  extraordinarily -- I think an extraordinarily violent sport.

11  They move faster, I think, on the ice than football players

12  do, but I think they are as large -- the players, the hockey

13  players themselves -- and, of course, they have really large

14  sticks, and so it's an extremely dangerous game.

15         And, unfortunately, as happens, Mr. Kienstra suffered

16  a concussion at approximately age 18, when he was into his

17  second year, in Detroit, that completely derailed his -- any

18  hope of a career.  One concussion makes another concussion

19  worse or more likely.  He suffered for a time from

20  post-concussion syndrome.  Saw a neurologist about it.  I

21  think he's mostly done with that but still suffers from

22  occasional headaches and tingling sensations at the ends of

23  his fingers and things like that.

24         His father mentions -- his father, George Kienstra --

25  and, George Kienstra, I should say, of course, is here -- says

1    that Kyle picked himself up as he did and did what he did

2    best, which was to be a personal trainer.

3         I have to say, Judge, I know what his father meant,

4    and I know that it was meant with love, but I have to say if I

5    were on a road to being a professional athlete in the United

6    States of America, and instead, because of my injury, had to

7    be a personal trainer, it seems to me now I'm helping other

8    people attain their goals.  Now I have to look the part.  I

9    have to work hard to get somebody else there.  I'm in the gym

10   all the time, and I'm never on the ice anymore, at least not

11   as a professional.

12        I think that it must have been a crushing blow.  He

13   was extremely young.  It was what he had literally devoted his

14   life to.

15        But he did pick himself up, and he did work, and as

16   far as I know, he worked consistently throughout that period.

17   And in some -- at some point during those years, he noticed

18   that he had friends who seemed to have a lot of extra money.

19   He noticed that they weren't working full time.  And he's not

20   by any means a stupid person, and he figured it out and put

21   two and two together and realized that these folks were going

22   to California and getting marijuana, where it's legal, of

23   course.  And so there's nobody with guns.  There's nobody --

24   there are people with licenses and, frankly, idyllic farms.

25   And that's what he started doing, and he was very successful

1   at it.

2           THE COURT:  I believe in California marijuana was not

3   completely legal.

4           MS. LAW:  It has been for some time.

5           THE COURT:  Okay.  So they didn't need a medical card

6   or anything like that?  They didn't have to get --

7           MS. LAW:  Not to grow.

8           THE COURT:  -- it from a dispensary is what you're

9   saying?  It's completely legal?

10          MS. LAW:  Not to -- well, not to grow it, Judge.

11  Growers needed to be licensed, and that's been the case for

12  quite some time, I think.  It's never been legal in the

13  federal system, and that's been a complication for quite some

14  time, and it's certainly not legal in Missouri.

15          THE COURT:  So for legal use in California, there's

16  no requirement of medical dispensary or anything else is what

17  you're telling me?

18          MS. LAW:  Yes.  You're correct, Judge.  You're

19  correct.

20          THE COURT:  Okay.  Thank you.

21          MS. LAW:  I was thinking of the growing end.

22          THE COURT:  Okay.

23          MS. LAW:  I was thinking of the end with which he was

24  involved.  I think that it makes a difference in the way it

25  feels and looks.  I think it makes it easier is all I'm

1   saying.

2          So the problem, of course, is it's a criminal

3   enterprise, as the Court certainly, I think, was walking up to

4   noting.  And the problem with criminal enterprises is that

5   they are not run by legal contracts.  They are not run by

6   legal means.  You can't call a collection agency if somebody

7   doesn't pay.  You can't sue them.  This is the way -- and, of

8   course, the biggest problem with criminal enterprises is at

9   the end of day we're in here because you get caught.

10          From the moment that Kyle was caught, he turned

11   himself in in California.  He was released that very day on

12   bond.  He returned here.  He was revoked from his bond through

13   his own actions.  They were not new criminal actions.  They

14   were actions that involved his being out of the state without

15   permission.  He was back here when that was discovered and

16   when the bond revocation was started.

17          I don't by any means minimize it.  I have already

18   spoken to him about the conversation he and I would have had

19   before that bond revocation had I been his lawyer.  They were

20   his actions to be sure.  But they were relatively minor.  He

21   waived the hearing.  He waived his motions.  And I believe

22   that he was if not the first person to plead in this case --

23   there's a sort of a companion case, the Thomas Anderson case.

24   If he was not the first person to plead, he was nearly the

25   first person to plead.

18

1          And at that plea, although I wasn't here, Judge, I

2    know how it went.  Mr. Casey would have read the frankly ugly,

3    sorry facts in his guilty plea agreement in front of many of

4    the same people who are in this courtroom today.  And I

5    imagine, as you always do, you would have turned to Mr.

6    Kienstra and said, "Mr. Kienstra, did you do those things?"

7          And under oath, in front of you and all of the

8    members of his family, Kyle said, "Yes, ma'am.  I did."

9          From that day on, Judge -- and those kinds of days

10   are the days that in my job I find the most humbling.  I think

11   that it is -- it takes a kind of courage to stand up,

12   especially in front of your mother and father and in these big

13   courtrooms and say to you, "Yes, I did that.  It's not pretty,

14   but I admit it.  I did it."

15         And, honestly, Judge, from that moment, from the

16   moment I have come to know Kyle Kienstra, he has turned his

17   back completely in every effective way that he could on his

18   past, on his compatriots, on his activities.

19         He has done -- and the Government's sealed letter is

20   extremely expressive and detailed.  This young man has, with

21   the same earnest forthrightness I imagine he applied to his

22   hockey game, has applied himself to the task of doing anything

23   and everything he can, or could, to earn that letter.

24         He's never turned away from it that I have seen.  He

25   has 20 hours, many, many, many hours we spent, many more than

1   I've ever spent -- and I've been involved in that sort of

2   thing a lot, Judge -- to the point where I think recent guilty

3   pleas were a result.  We spoke about other things at side bar.

4          And so my point is, at the end of the day, is there

5   anybody here in this courtroom who can say, "I have never hurt

6   anyone; I have never done anything that I regret; I have never

7   done anything that I wish I could take back; I have never done

8   anything that I'm going to regret and rue for the rest of my

9   life"?  I certainly would not trust someone who suggested that

10  to me.  I certainly am not that person.

11         But at the end of the day all we can do is atone,

12  Judge, and try to make amends.  I wish there were more we can

13  do.  Sincerely, I wish that there were, but there's not.

14         I believe that this young man is a different person

15  from the man he was, certainly from the man he was when he

16  turned himself in to the District Court in California, and

17  certainly a different man from the man he was when he went to

18  the St. Genevieve County Jail.  He's never been in jail in his

19  life.  He's never, as far as I know, had a traffic ticket.

20         And one of the things, I think, that impressed me,

21  Judge, about the letters that I saw, all of the letters -- all

22  of them -- talk about what a loving person this is, what a

23  giving person this is, what a -- the kind of person that gives

24  back to the community.

25         I think three of the letters talked about -- one of

1   them was from his cousin Morgan Olson.  And just so that you

2   know, Morgan Olson is a young lady.  She mentions in her

3   letter that she only has girly sisters and so it was fun for

4   her to work out with her cousin Kyle Kienstra.

5         And I thought, oh, gee, I'm sorry that that young man

6   said that, but in fact when I met her today, it struck me as

7   kind of cute.

8         But her letter, which I want to say is K, I think

9   it's Exhibit K, it's a very sweet letter.  She mentions it.  I

10  believe that Carol Olson, who is Kyle's grandmother who's in

11  the courtroom, and one other person mentioned the fact that

12  when he got to St. Genevieve in December, he noticed that

13  there were some folks who not only didn't have visitors but

14  who didn't even have any commissary, and so pitched in and

15  bought pizza, I think, or some food for everybody for

16  Christmas so that they could have a Christmas.

17        This is a young man who I think can come home and

18  move on.  I think that's possible.  He's bright.  I think he's

19  done his best to own what he's done and face what he's done

20  and take substantial steps to do what he can to make it

21  better.

22        He has, as you can well see, enormous support from

23  his community.  There is not a letter that didn't say to you

24  "He's an asset to the community; he's not a detriment."

25        I don't believe that he's a danger to the community,

1   Judge.  I think that he has learned from his mistakes.  And he

2   is young enough and, frankly, has been given an amazing and

3   unusual gift, which is the kindness and patience and support

4   of the very government that prosecuted him.  I think he stands

5   in a unique position to really come away from this a better

6   man and a better citizen.

7        And so I want to ask you to depart substantially,

8   Judge.  The only reason it makes a difference to me whether

9   the bottom of his range is 108 or 120, -21, is because I was

10  going to ask you to cut it in half.  I don't think that's a

11  ridiculous request.  I try not to do that.  I've been in this

12  courthouse for a long time, and I try not to come in here and

13  ask things of you judges, all of the judges in this

14  courthouse, that will make your eyes roll back in your head

15  the next time I walk through the door.  I don't want to do

16  that.  It doesn't do any of my clients any good.  But I don't

17  think that's a ridiculous request, Judge.

18       I've seen the other two sentences that were handed

19  down.  Frankly, I've discussed them with Mr. Casey, and I

20  don't think that Mr. Kienstra is in a similar situation with

21  those other two.  I'm not going to come in here and ask you to

22  send him home, but I don't think 67 months is fair either,

23  Judge.  There's no criminal history here, meaning that Kyle

24  Kienstra is in a position to really have the jail sentence

25  have the impact we want it to have on him.

22

1      Frankly, I think that the almost nine months he spent

2   in the local jail have had that impact on him.  In other

3   words, I think this is the kind of man who's going to say

4   "I've been there.  I never want to go back there.  I don't

5   want to have anything to do with that.  I want to come home

6   and work and be a paying member of society."

7      And so I think the statistic show that lower

8   sentences actually tend to have a better impact on lowering

9   recidivism, and I think it's because they give hope.  I think

10  it's because they give faith in the system.  I think it's

11  because it means something, especially to a young person like

12  Kyle to have somebody in your position as well as somebody in

13  Stephen Casey's position.  And he's already done it, and I

14  thank him.  It means something for somebody like Kyle Kienstra

15  to have somebody like you say, "You know what?  I think you

16  can do that, and I want you to do that, and so I'm going to do

17  my best to give you an opportunity to."

18      So that's what I think about the arc of this young

19  man's life.  He's done some bad things, he's made some

20  mistakes, it's true; he's also done a whole lot of good

21  things, and I think he has a whole lot more left in him.

22      So we would ask that for you, Judge.  I would ask

23  that you waive a fine.  I know that you have to impose a

24  restitution sentence.  I would ask that you order that it be

25  paid in nominal periodic payments.  I don't believe that it's

1    ever paid -- well, maybe it is -- through the prison system.

2    I would like to be able to keep it as low as we can just to

3    give this young man a chance to get on his feet when he comes

4    home, whenever that may be.

5            And I would also ask that you waive any interest on

6    the restitution order, Judge.  It's my understanding that

7    there may be some setoff -- that's not the proper word -- for

8    that down the line, but I also understand that that's not

9    going to happen right away.

10           And, Judge, I was going to ask you a rather unusual

11   thing.  I was going to ask that you release him and allow him

12   to turn himself in voluntarily.  I will tell you --

13           THE COURT:  That is unusual.

14           MS. LAW:  Yes, I know.  I've only done it once

15   before.  I've only done it once before, and it was 25 years,

16   and the circumstances were not the same.  I will tell you,

17   quite frankly, before I make him do it, that Mr. Casey has

18   already told me the Government opposes that.  I will also tell

19   you, quite frankly, that I've spoken to Mr. Diekemper.  Mr.

20   Diekemper was the supervising pretrial services officer, and

21   Mr. Diekemper has told me that his office opposes it as well,

22   Judge.

23           What I've discussed with Mr. Kienstra -- and the

24   reason is for this, Judge.  I'll be very, very frank.  He's --

25   his security level is 3 points less if he surrenders

24

1    voluntarily.  I don't think it makes a difference if he

2    surrenders himself tomorrow.  I don't think it makes a

3    difference if he surrenders himself next Tuesday.  I think the

4    point is that he was released and that he was told to

5    surrender, and he did it.

6         If there are concerns -- and I think I would have

7    them were I in your chair because the nature of his petition

8    for revocation was that he been out of town, although he did

9    come back.  He had been out of town without permission.  And

10   so Mr. Kienstra and I have discussed this, and I think were

11   you to consider this, Judge, he would be willing for you to

12   make there be a condition that he reside in a halfway house.

13   He would be willing for you to say, "I want GPS devices

14   installed on your person", or an electronic monitoring device

15   so that we know exactly where you are at every time of the day

16   and night.

17        I don't believe he would care if you said, "You are

18   on total lockdown at your home, and you may not leave at all."

19   And I certainly do not believe that he would care if you said,

20   "And you have to turn yourself in" whenever, next Tuesday, and

21   not wait until the marshals come to give you the order telling

22   you that you've been designated.

23        I'm hoping to let him be in a Bureau of Prisons

24   facility where he will be able to work, where he will be in a

25   less restricted environment.  Quite frankly, that's the entire

1    reason that I'm asking you for that.

2         Oh.  We also, Judge -- this was in my sentencing

3    memorandum, but I'll repeat it just because there's been sort

4    of a lot going on this afternoon.  I had also asked that you

5    recommend the RDAP program for him.  I do not know that he

6    will qualify, and I do not know that he will get credit, but I

7    do know that he needs to have the Court's recommendation just

8    to get his foot in the door, and so I'd like to just have that

9    on the record in case he's able to do it.

10        And we would also request that you recommend --

11   again, you can only recommend -- that he be given the credit

12   under the Second Chance Act, which I think is 18 U.S.C. 3621.

13   It's either 3621 or 3624.  It's in the sentencing memorandum.

14   The Bureau of Prisons now will at least consider a Court's

15   recommendation that someone be given 12 months in a halfway

16   house on the way home rather than the old 6 months to 10

17   percent, whichever was less, is what I think the statute used

18   to say.  And, again, you can only recommend it, Judge, and

19   they're not bound by your recommendation.

20        THE COURT:  Well, and they can do that without my

21   recommendation.

22        MS. LAW:  I believe that they can.  I believe that

23   they can, Judge.  And so that's --

24        THE COURT:  All right.  Mr. Kienstra, do you wish to

25   make any statements to me before I impose sentence in your

1    case?  It's your right to do so, and this is your opportunity.

2              THE DEFENDANT:  Yes, I do.

3              THE COURT:  Okay.

4              THE DEFENDANT:  First, I want to apologize for my

5    criminal behavior, and I really do mean that with all

6    sincerity.  You know, I acknowledge I made some big mistakes,

7    and I take full responsibility for them.

8              During my eight months in St. Genevieve, I've changed

9    a lot as a person, and I've definitely learned from my

10   mistakes.  I'm not going to dwell on the past because I can't

11   change that, and I'm not going to let this define me as a

12   person.  I believe what will define me is how I respond to

13   this adversity.

14             The keys to my future -- not lie in the BOP, and I'm

15   going to take full advantage of all the programs they have to

16   offer and just get the most out of this as I can.  I'm not

17   going to use my years in prison as wasted years of my life.  I

18   think I will be a better man because of this experience and

19   all the things that I have learned through it.

20             Finally, I would like to extend my deepest apologies

21   to my family and friends for putting them through this.  Words

22   cannot describe how much it means to me to have you guys by my

23   side during these hard times.  You guys are truly amazing.  I

24   could not ask for a better support team.

25             Thank you from the bottom of my heart.

1          THE COURT:  Mr. Casey, on behalf the Government?

2          MR. CASEY:  I have nothing, Judge.

3          THE COURT:  Okay.  Well, as I said, I'm granting

4     the -- I am going to grant the Government's motion.

5          Ms. Law had a lot to say, and there is -- the

6     memorandum and the letters were extensive, and I have read

7     them.

8          I will say there is one thing about this defendant

9     that has not actually been said out loud in court, and I'm not

10    sure why.  At the plea I did not require this.  It may have

11    been because of the people, but all those letters from people

12    talking about what a great, great person you are, none of them

13    acknowledged the fact that you fire bombed -- I know you

14    didn't get your hands dirty.  You ordered people to do it, and

15    they followed your orders.  You fire bombed an innocent

16    72-year-old widow's house.  You caused $300,000 damage to that

17    house.

18         You ordered the people who worked for you to kidnap

19    and beat someone you thought had stolen money from you.  They

20    held him in a bathroom for three days, calling you on the

21    phone the whole time, taking directions from you about what

22    should happen.

23         You are not a nonviolent drug offender.  You are a

24    violent drug offender.  So all the talk about how we're

25    filling up our prisons with nonviolent drug offenders doesn't

1   apply to you because you're a violent drug offender.

2           And you sound very remorseful.  You've had every

3   advantage in life.  You have all these people who care about

4   you.  And you still turn to this life of crime.  You're very

5   young, and I find it extremely sad.

6           I have the opportunity not to have to send you to

7   jail for ten years.  I'm not going to send you to jail for ten

8   years.  I'm going to sentence you to jail for seven years,

9   which is 84 months.  That's a substantial departure from the

10  sentencing guidelines.  It's a substantially low sentence

11  given your role in this offense and your violent acts in

12  directing others to do this.

13          Your lawyer's right.  There's no evidence before me

14  that you ever possessed a gun.  There's no evidence before me

15  that you ever hit a person or did any violence yourself.

16  However, when you have other people working for you and you

17  tell them to do that and you're on the phone with them over

18  and over again -- and this is all undisputed evidence in the

19  presentence report, and you admitted it in your plea

20  agreement, although I didn't make you say it out loud, but you

21  did admit to me that everything in that agreement was true.

22  This is extremely serious.

23          The person you fire bombed was an innocent victim.

24  She had nothing to do with drug dealing.  She had the

25  misfortune of living next door to somebody.  So, you know, you

1    sent people to cause damage to somebody who weren't smart

2    enough to even figure out how to fire bomb the correct house.

3    These are really, really serious things.

4          Additionally, you were given the opportunity because

5    of your lack of prior convictions to remain out on bond.  You

6    went to Chicago for a party knowing that, if you had asked to

7    go out of town, it would be denied because you had already

8    asked once to go out of town and it had been denied.

9          You went to a party, and whether -- I don't know if

10   it was you or somebody else decided to post the pictures of

11   you all living the high life and drinking your expensive

12   champagne at an expensive club.

13         You've got all of this support.  You've got all of

14   these resources.  And so many people who stand before me turn

15   to lives of crime and commit criminal acts and they had

16   terrible upbringings and terrible problems.  You had

17   everything given to you, and you chose to engage in the

18   criminal lifestyle that you did.

19         And to say that, man, it looked easy because in

20   California everybody was doing it and there was some legal

21   stuff, well, you know what?  If it were really that great, you

22   wouldn't have made so much money from it.

23         And, you know, it's also easy to buy pizza for other

24   prisoners when you've been making all these millions of

25   dollars in drug sales.  Yeah, I'm never sympathetic when

1   people tell me they gave money to their community when I know

2   they made huge amounts of money in the drug business because

3   it's drug money.  It's dirty money.

4        So I think you have a good lawyer.  She made really

5   good arguments for you.  You have supportive family.  You have

6   done well for yourself since you went to jail, but it looks to

7   me sitting here that all these changes didn't happen when you

8   got charged with this case.

9        I mean, if you read the presentence report, people

10  were getting arrested.  Drugs were being seized.  Stuff was

11  happening all the time.  You guys just kept on going.  You

12  didn't stop your drug business when you knew the police were

13  getting close.  I mean, I guess you all were arrogant, I don't

14  know, but you finally turned around, it looks to me, like when

15  you got St. Genevieve County Jail.

16       Well, yeah.  That's not a very nice place to be.  And

17  I'm sorry you're there.  I'm sorry anybody's there.  But it's

18  not like you suddenly had a revelation that you had lived your

19  life the wrong way.  Once you got to jail, you changed.  And I

20  believe it's a genuine change, but I don't think anybody in

21  the room should be thinking that you somehow are, you know,

22  this unsullied person who just made a mistake here or there.

23       For four years you ran a very extensive criminal

24  organization, and people did your bidding.  Why?  I don't

25  know.  I guess because of the money.  Maybe other reasons.

1          So, yeah, I'm sure there's nobody here who can say

2     they've never done anything they don't regret, but I bet

3     there's a lot of people in this courtroom who have said, "I've

4     never fire bombed an innocent 72-year-old woman's house."

5     "I've never ordered somebody kidnapped and beaten and held for

6     days."  Most of us don't do that even if we make mistakes.

7          So I'm going to give you seventy -- I mean 87 years

8     [sic], which is 84 months.  I'm not going to release you on

9     bond.  I see no reason to do that.  It just -- this is a

10    mandatory detention issue, and so there's simply -- it's

11    simply not there.  I'm not going to do that.  I am going to

12    order, you know, supervised release to follow this and

13    restitution.  I will tell you the other things as we get

14    there.

15         So I've considered all of the sentencing factors.

16    I've considered the seriousness of the crime and the history

17    and characteristics of the defendant.  I believe that this

18    term of 84 months in jail, or seven years, is necessary to

19    reflect the seriousness and provide, I think, that punishment

20    is appropriate in this case given the violence involved and

21    the very, very extensive and long-term drug enterprise and

22    your role in the offense.

23         So seven years.  And just so it's really clear, seven

24    years is way lower than a lot of people have gotten for drug

25    offenses in similar conduct in the past.  I believe in today's

1   world where we are giving lower sentences it is appropriate

2   under all of the considerations.

3        I have considered the need for incapacitation, in

4   other words keeping you in jail so you won't commit more

5   crimes.  At this point in your life, I believe that is still

6   an issue.  I believe seven years is necessary to meet that

7   sentencing objective.  I believe that for general deterrence,

8   in other words to show others that they should not commit this

9   kind of crime, seven years is necessary to meet that.

10       I agree that you don't need any of the treatment

11  programs that are available in jail because you don't have

12  any -- the presentence report has no indication of any

13  problems that would require treatment.

14       I have considered the 3553(a) factors, the guidelines

15  recommendations.  I've considered the need to avoid

16  unwarranted sentencing disparities and, to the extent I can,

17  have tried to see that this would be a sentence that is

18  commensurate with similar sentences to similar people.

19       I've considered the need for you to be able to pay

20  restitution when you get out.  I do hope that the -- that some

21  of the forfeited property can be used to pay restitution, but

22  as I said to you at side bar, if for some reason that doesn't

23  happen, the restitution is still owed and must be paid.  And

24  that will continue until you have paid it in full.  If it's

25  allowed to be done through the forfeiture, forfeited property,

1  that's great, but you will still have to do that.

2       So I've considered all of the factors listed in the

3  statute, and I believe that this sentence is the minimum

4  sentence that is sufficient to meet the sentencing objectives

5  in the case.  It's not greater than is necessary, but it is

6  sufficient to do so.

7       And I do hope that when you do get out, Mr. Kienstra,

8  you will do what everyone has said you're going to do and that

9  is turn your life around, find the right way to live, live a

10 lawful life, and not be engaged in this kind of activity.

11      I do -- I am a little concerned that you've got a lot

12 of support from your family.  And, you know, sometimes support

13 from family is a wonderful thing.  I'm glad that you have such

14 a loving and big family and they all care about you, and

15 that's great, but sometimes big supportive families become

16 enablers.  If it were substance abuse, we'd talk about

17 enablers.  Are they helping you?  Are they, like, saying,

18 "Poor Kyle; he got caught; he's being treated badly"?  You

19 know, "Gee, we hope everybody else gets higher sentences

20 because our little boy doesn't deserve this"?

21      If they are, that's not the kind of thing you need to

22 listen to.  I don't know if that's what they're saying, but I

23 would warn you against it because sometimes family members can

24 be a little too supportive and make you think that you didn't

25 do anything wrong and that you're somehow a victim in this.

1   So you need to stand on your own two feet.  And it's great you

2   have the support, but supporters are not always infallible.

3          So here's the sentence.  For the reasons I've stated,

4   it's the judgment of the Court that the defendant is committed

5   to the custody of the Bureau of Prisons to be imprisoned for a

6   term of 84 months.  Upon release from imprisonment, the

7   defendant will be placed on supervised release for a term of

8   three years.  This is also -- both of these are departures

9   under 5K1.1.

10          Within 72 hours of release, the defendant must report

11   in person to the probation office in the district to which he

12   is released.

13          It's further ordered that the defendant must make

14   restitution in the total amount of $335,504.06 to Triple A

15   Insurance in the amount of 33 -- let me try this again --

16   $333,234.06.  And as to this victim, the obligation is joint

17   and several with Brent Gibbar and Michael Saracino, meaning

18   that no further payments will be required after the sum of the

19   amounts actually paid by all defendants is fully covered the

20   compensable injuries.

21          Payments of restitution must be made to the clerk of

22   court for transfer to the victims, and the interest

23   requirement on the restitution is waived.

24          The next victim is in the -- listed as with the

25   initials of C.O.  And this is the deductible amount on that

1    insurance policy, and it's in the amount of $1,000.  This is

2    the victim of the fire bombing, and this obligation is also

3    joint and several with Brent Gibbar and Michael Saracino.

4    And, again, the interest requirement is waived.

5            And then finally to the victim known as J.M. listed

6    in the presentence report in the amount of $1,270.  It's my

7    understanding that's his medical expenses.  And in this case,

8    that obligation is joint and several with Brent Gibbar, again

9    meaning that no further payments once this victim has been

10   fully paid by any defendant.  And the interest requirement on

11   the restitution is waived.

12           All criminal monetary penalties are due in full

13   immediately and must be paid through the clerk of the court.

14   If the defendant cannot pay in full immediately, then you must

15   make payments under the following minimum payment schedule.

16           I will recommend to the Bureau of Prisons that during

17   incarceration the defendant participate in the -- or that the

18   defendant make payments through an installment plan in

19   accordance with the Bureau of Prisons inmate financial

20   responsibility program and make payments at the rate of 50

21   percent of the funds available to him.

22           If you owe any monetary penalties when released, then

23   you must make payments in monthly installment of at least $200

24   or no less than 10 percent of your gross earnings, whichever

25   is greater, until the payments -- with those payments to begin

1    no later than 30 days after release from imprisonment.

2           Until all of the criminal monetary penalties are paid

3    in full, you must notify the Court and the U.S. Attorney's

4    financial litigation unit of any material changes in your

5    economic circumstances that might affect your ability to make

6    these payments, and you must notify them of any change in your

7    mailing or residence address.

8           So I will recommend to the Bureau of Prisons that you

9    participate in the inmate financial responsibility program

10   while incarcerated if that's consistent with their policies.

11          While on supervised release, you must comply with the

12   standard conditions that have been adopted by the Court and

13   with the following additional conditions.  If there are any

14   costs associated with these services, you must pay them based

15   on a co-payment fee established by the probation office.

16          You must refrain from any unlawful use of a

17   controlled substance and must submit to a drug test within 15

18   days of beginning supervision and at least two drug tests

19   thereafter.

20          Because this is a drug case, although I have no

21   evidence that you have ever abused drugs, because the drug

22   case shows that you have ready access to drugs, if you wish, I

23   believe it's important that you -- oh, I'm sorry -- be tested,

24   but it's just the mandatory test.  I'm sorry.  I'm not doing

25   any additional drug tests.  I apologize.

1       But if there's any evidence that you're using drugs

2   while on supervision, obviously we would modify and require

3   further treatment if that should happen.

4       Because it's a drug case, however, and because of the

5   nature of selling drugs, I am going to require the search

6   condition; that is, that you must submit your person,

7   residence, office, or vehicle to a search conducted by the

8   probation office based upon reasonable suspicion of contraband

9   or evidence of a violation of a condition of release, and you

10  must warn any other residents of your premises about this

11  search condition.

12      So long as there's any money owed on the monetary

13  penalties, you must provide the probation office and the

14  financial litigation unit of the U.S. Attorney's office with

15  access to any requested financial information, and the

16  probation office may share any information it has with the

17  U.S. Attorney's office.

18      You may not incur any new credit charges or open

19  additional lines of credit without the approval of the

20  probation office so long as there is any balance on the

21  court-imposed financial obligation.

22      If you receive any money from any expected or

23  unexpected financial gains, including things like tax refunds,

24  inheritances, or judgments, they must be applied to the

25  outstanding court-ordered financial obligation.  You must

1  immediately notify the probation office if you receive such

2  money.

3        Because of the violent nature of the case, you are

4  ordered that you may not enter the premises or loiter near

5  where either of the victims reside, are employed, or frequent

6  except under circumstances approved in writing by the

7  probation office.

8        You must pay the restitution as a condition of

9  supervised release.

10        I do find that the defendant does not have the

11  financial ability to pay a fine in addition to the

12  restitution; so no fine is ordered.

13        It is ordered, however, that the United States -- I

14  mean the defendant must pay to the United States the special

15  assessment of $100, which shall be due immediately.

16        It is also ordered that all the property that was

17  listed on the preliminary order of forfeiture that was entered

18  on May 27, 2015, is now finally ordered forfeited, and this is

19  an oral declaration of forfeiture of this property.  Any

20  interest that Defendant Kyle Kienstra may have in any of the

21  property listed on that preliminary order is forfeited to the

22  United States at this time.

23        So this will be the sentence in the case.  I know

24  there's some other requests, but before we get to those, are

25  there any -- does either counsel know of any legal reason why

1  this sentence could not be imposed?

2          MR. CASEY:  I do not, Judge.

3          MS. LAW:  No, Judge.

4          THE COURT:  Okay.  So now what I'm going to do with

5  your lawyer's requests are as follows:  As I mentioned, I'm

6  going to recommend to the Bureau of Prisons that you

7  participate in the financial responsibility program.  I'm not

8  going to allow a temporary release on bond.

9          Your lawyer asked me to recommend that you

10  participate in the residential drug abuse treatment program.

11  However, there is no evidence anywhere in the record that you

12  have ever abused drugs.  There is no evidence you've used

13  them.  You refused to provide information for the presentence

14  report.  I have no reason to believe that you would benefit

15  from or should go to that program.

16          If the Bureau of Prisons feels otherwise, I have no

17  objection to their sending you to the program, of course, but

18  I'm not going to recommend it because there's simply no basis

19  for me to do that.

20          I'm similarly not going to recommend that they treat

21  you any -- that they use the second chance thing to give you

22  early release to the halfway house.  I have no objection to

23  their doing that, but I have no reason to recommend that in

24  this case either.  So I'm simply not -- I'm not objecting, but

25  I'm not recommending those things.

1          I believe that covers the requests that were made in

2    the sentencing memo in terms of recommendations.

3          Do you want me to make any other recommendations to

4    the Bureau of Prisons?

5          MS. LAW:  With respect to placement, Judge,

6    designation, Mr. Kienstra has asked that I request that the

7    Court recommend -- and, again, we understand that it's just a

8    recommendation -- if he qualifies for the facility at

9    Greenville, that would be his first choice.  If he does not,

10   he would prefer to go to Oxford.

11         I don't know -- I know that there is -- I think it is

12   only a USP -- maybe it's an FCI that's at Greenville for men

13   now.  I can't remember.

14         THE COURT:  They keep changing it.  I can't remember

15   either.

16         MS. LAW:  So I don't know if he'll qualify.  And,

17   obviously, if he doesn't qualify, he doesn't qualify, but he

18   would prefer to go there if he can and, if not, to the

19   facility at Oxford, Wisconsin.

20         THE COURT:  Oxford -- is it Wisconsin?

21         MS. LAW:  Yes.

22         THE DEFENDANT:  Yes.

23         MS. LAW:  I think it is, Judge.

24         THE COURT:  Okay.  I'll make those recommendations to

25   the Bureau of Prisons regarding placement.  These are only

1    recommendations as Ms. Law indicated.  And so I'm –– if they

2    don't place you in either of those locations, there's nothing

3    I can do about that.  But I will recommend that if it meets

4    their regulations that they house you at one of the facilities

5    either at Greenville, Illinois or at Oxford, Wisconsin, you

6    know, depending on their regulations.  And I believe that's

7    it, right?

8            So, Mr. Kienstra, if you wish to appeal this

9    sentence, any appeal –– the sentence I've just stated is the

10   sentence.  Then if you wish to appeal this, any appeal must be

11   filed by you within 14 days.  If you do not file a notice

12   within 14 days, you will be forever giving up your right to do

13   so.

14           You have the right to be represented by an attorney

15   in taking an appeal, and if you can't afford a lawyer, one

16   will be appointed for you at no cost to you.  If you request,

17   the clerk of the court will assist you in filing a notice of

18   appeal.  The United States also has the right to appeal, the

19   same right to appeal the sentence.

20           So defendant then is remanded to the custody of the

21   marshals for imposition of sentence at this time.  Court is in

22   recess.

23           **(PROCEEDINGS CONCLUDED AT 4:10 PM.)**

24

25

<u>CERTIFICATE</u>

      I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

      I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

      I further certify that this transcript contains pages 1 through 41 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

      Dated at St. Louis, Missouri, this 20th day of October, 2015.

_____
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter